**IN THE UNITED STATE DISTRICT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) JOHN BUMGARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-26-GKF-TLW |
| | ) | |
| 2) THE WILLIAMS COMPANIES, INC., and | ) | |
| 3) ENERGY TRANSFER EQUITY, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff, John Bumgarner, for himself and members of the Class, alleges:

**Nature of the Action**

1.       This is a shareholder class action brought by Plaintiff on behalf of the public shareholders of The Williams Companies, Inc. ("Williams" or "WMB") against Williams and Energy Transfer Equity, L.P. ("ETE").  The action is to enjoin the Defendants from further proceeding with a proposed merger, including the dissemination of proxy materials, and the conduct of a special shareholders' meeting of Williams.  The merger, including the dissemination of proxy materials, and the conduct of a special shareholders' meeting of Williams are herein referred to as the "Proposed Acquisition".[1]

---

[1]   The Proposed Acquisition is the subject of six complaints filed in the Chancery Court of Delaware:
>    *Scott Ozaki v. Alan S. Armstrong, et al.*, Case No. 11574;
>    *Richard Greenwald, et al., v. The Williams Companies, Inc., et al.*, Case No. 11573;
>    *Allison Blystone v. The Williams Companies, Inc., et al.*, Case No. 11601;
>    *Ira Glener, et al., v. The Williams Companies, Inc., et al.*, Case No. 11606;
>    *Larry Amaitis v. Alan S. Armstrong, et al.*, Case No. 11809; and
>    *State-Boston Retirement System, et al., v. Alan S. Armstrong, et. al.*, Case No. 11844

## The Parties

2.      Plaintiff is and has been a stockholder of Williams and Williams Partners, L.P. ("WPZ") at all times relevant hereto.

3.      Williams is a Delaware corporation with principal executive offices at One Williams Center, Tulsa, Oklahoma.  Williams is primarily an energy infrastructure company focused on connecting North America's significant hydrocarbon resource to growing markets for natural gas, natural gas liquids, and olefins.  As of December 31, 2014, Williams' interstate gas pipelines, midstream, and olefins production interests were largely held through their investments in Williams Partners L.P. and Access Mid-Stream Partners, L.P. ("Access"). On February 2, 2015, Williams completed the merger of the two previously stated master limited partnerships.  The merged partnership is named Williams Partners L.P. ("WPZ"), and following the merger, Williams owns approximately 60% of the merged partnership, including the general partner interest and incentive distribution rights. As of February 1, 2015, Williams had approximately 6,742 full time employees, a large number of whom live in Tulsa, Oklahoma. Upon completion of the Proposed Acquisition, Williams will be merged with and into Energy Transfer Corp LP ("ETC"), and cease its separate corporate existence.

4.      The equity securities in ETC that Williams' shareholders will receive under the Proposed Acquisition will be in a new, previously untraded entity.  Ownership in ETC has many bad financial characteristics as compared to ownership in Williams stock:

---

Each of these cases alleges multiple breaches of fiduciary duties by the members of the Board of Directors of Williams.  Because of the Williams' By-laws, these actions have been forced into Delaware, and have largely gone unreported in Oklahoma.

In addition, another case, *City of Birmingham Retirement and Relief System v. Alan S. Armstrong, et al.,* Case No. 16-cv-00017, has been filed in the United States District Court of Delaware, which alleges violation of Section 14 of the Securities Exchange Act of 1934 and breaches of fiduciary duties by officers and directors of Williams.

A.      ETC will be burdened with incentive distribution rights ("IDRs") that require

ETC to pay an increasing percentage of its cash flow to Energy Transfer Equity, L.P. ("ETE")

over time.

B.      The IDR burden at ETC has the effect of reducing the growth rate of cash flow

available for ETC shareholders over time.

C.      Shareholders of ETC have no authority to elect or remove members of the board

of directors that governs its business.

D.      ETC is governed by a board of directors whose members are selected by one

individual, Kelcy Warren, who also serves as chairman of the board.

E.      The board that governs ETC is held to a lesser standard of fiduciary duty relative

to a typical corporation.

F.      There are inherent conflicts of interest between ETE shareholders, including

Kelcy Warren, and ETC shareholders.

G.      ETC shareholders are powerless to prevent ETE from taking actions that benefit

ETE shareholders at the expense of ETC shareholders because of the poor governance structure

of ETC.

5.      Defendant ETE is a Delaware limited partnership with principal executive offices

at 3738 Oak Lawn Avenue, Dallas, Texas.  Its officers and agents purposefully initiated and

directed activity within Oklahoma to achieve an acquisition of Williams, including making

numerous jurisdictional contacts with the state by telephone, letters and email, requesting due

diligence information from Oklahoma sources, and availing itself of the laws of Oklahoma, *e.g.*,

common law fraud with respect to representations made by Williams.  These acts have caused

and threaten injury within Oklahoma.

3

6.      Upon completion of the Proposed Acquisition, ETC will contribute to ETE all of the assets and liabilities of Williams in exchange for the issuance by ETE to ETC of a number of ETE's Class E common units equal to the number of ETC's common shares issued to Williams stockholders in the Proposed Acquisition.  Also in connection with the Proposed Acquisition, ETE will subscribe for a number of ETC's common shares at the transaction price, in exchange for the amount of cash needed by ETC to fund the cash portion of the proposed consideration. As a result, defendant ETE will own approximately 19% of ETC's outstanding common shares upon completion of the Proposed Acquisition.  ETE is a provider of services to producers and consumers of natural gas, natural gas liquids, crude oil, and refined products.  ETE currently holds approximately 71,000 miles of natural gas, natural gas liquids, refined products, and crude oil pipelines today.

## Jurisdiction and Venue

7.      This Court has subject matter jurisdiction over this action by virtue of Section 27 of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a *et seq*. (the "Exchange Act").  Venue is also proper in this Court by virtue of 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

8.      General jurisdiction exists over Williams because it is registered to do business in Oklahoma.  Personal jurisdiction exists over ETE because of its alleged actions and contacts directed at Williams in Oklahoma, and its shareholders within Oklahoma.  Given ETE's conduct as alleged herein, it is reasonable and fair under the United States Constitution to exert jurisdiction over ETE in this judicial district.

## Background

9.      Prior to any announcement of the Proposed Acquisition, Williams' common stock closed on June 19, 2015 at $48.34 per share.  On the morning of September 28, 2015, Energy

Transfer Equity, L.P. (ETE) and Williams announced the Proposed Acquisition valued at approximately $37.7 billion with Williams at $41.69 before the market opened.  At the close of stock market trading that same day, Williams' stock dropped -12.1% to $36.56 per share (Source: Bloomberg).  It is highly unusual for a company being acquired to see its stock price decline on the day the transaction is announced.  It can be noted that the Williams' stock is now down to approximately $14.50.  The material decline ($41.60 to $14.50) in the Williams stock price in large part due to the merger announcement demonstrates that Williams shareholders were not offered a normal premium for control of their shares.

10.    It is important to note that a takeover premium (*i.e.,* a higher stock price relative to a stock's trading range immediately prior to a merger announcement) is easy for any investor to understand, regardless of training or experience.  Conversely, "**other**" merger related opportunities like projected cost savings and who benefits from them, so called potential commercial synergies, and estimates of future growth in earnings or dividends are difficult for investors to evaluate.  In the case of this proposed merger, the opportunity for confusion among public investors is higher than usual because the purported benefits of the transaction are entirely dependent upon "**other**" benefits due to the complete absence of a takeover premium.

### The $2 Billion Misrepresentation

11.    On the day of the Proposed Acquisition announcement, September 28, 2015, Williams and ETE issued a joint press release that described the Proposed Acquisition and purported benefits from it to shareholders of Williams and to stakeholders of WPZ (the "Press

Release").[2]  The Press Release was published in the *Tulsa World* and elsewhere, and was posted

on ETE's and Williams' websites, the latter of which was hosted in Tulsa, Oklahoma.

12.     Certain of the statements in the Press Release, as stated hereafter, are material

misrepresentations made by Williams and ETE, or by ETE and the publication of the material

misrepresentations was aided and abetted by Williams.

13.     The following bullet points are copied verbatim from the Press Release:

*ETE and Williams believe there are numerous meaningful benefits from a proposed combination:*

***ETE Stakeholders***

- *At closing, the transaction will be immediately accretive to distributable cash flow and distributions per unit for ETE and is expected to be credit positive to ETE's credit ratings;*
- *ETE's distribution growth rate is expected to remain at its current level;*
- *as a result of diligence, the size of both the expected cost savings and the anticipated commercial synergies exceeds ETE's previous expectations and will help ensure that the duration of ETE's distribution growth rate will be longer as a result of the transaction;*
- *the introduction of cash into the transaction consideration has reduced the ETC share issuance by over 260 million shares (or approximately 18.5% of the overall ETC share issuance);*
- *the number of possible opportunities to migrate assets within the Energy Transfer family and find additional commercial opportunities, not currently quantified, within the expanded asset base will increase significantly, thereby creating more value for ETP, SXL, WPZ and SUN, which in turn will result in increased cash flow growth for ETE;*
- *the ability of ETE to broaden its overall shareholder base through the ETC structure; and*
- *the creation of ETC will result in increased liquidity for ETE unitholders because of the option for ETE unitholders to exchange ETE common units for ETC common shares.*

---

[2]  A true copy of the press release as published in the *Tulsa World* is attached as Exhibit 1.

**Williams Stakeholders**

*A compelling transaction that provides Williams' stockholders with:*
- *an attractive premium to the implied trading price of WMB assuming WMB traded in line with either the Alerian index or its midstream peers since the date of ETE's initial offer;*
- *a pro forma level of dividend per ETC common shares received that will exceed the 2016 dividend per WMB share that Williams had forecast on a pro forma basis for the Williams/WPZ merger;*
- *ETC dividend growth superior to that of Williams on a pro forma basis for the proposed Williams/WPZ merger;*
- *the option to elect cash in the transaction will allow Williams' stockholders to monetize, on a taxable basis, all or some of their investment in WMB, subject only to the aggregate $6.05 billion pool of cash consideration being fully utilized;*
- *the exchange of WMB shares for ETC common shares is expected to be tax free to WMB stockholders, except with respect to cash received;*
- *for each outstanding ETC common share, ETC will receive from ETE the same cash distribution per quarter as ETE distributes with respect to each ETE common unit;*
- *ETC will benefit from a dividend equalization agreement through calendar 2018 that ensures that ETC shareholders will receive the identical cash dividend as an ETE unitholder;*
- *the CCR is intended to address any trading price differences between ETC and ETE during the two-year period following closing;*
- *ETE will become co-obligor of Williams' existing debt and Williams' credit facility will be terminated at closing; and*
- *ETC common shares are expected to have tremendous liquidity, a strong growth profile and the potential for inclusion in the S&P 500 index (similar to WMB's current inclusion in that index).*

**WPZ Stakeholders**

- *There is no expected impact to WPZ's credit ratings as a result of the ETE/Williams combination;*
- *WPZ unitholders will have greater distributable cash flow from material cost savings and synergies of up to $400 million per annum with WPZ joining the Energy Transfer shared service model;*

7

- *the combination will create new commercial opportunities for WPZ, including the potential to acquire assets from the overall Energy Transfer group, that will improve WPZ's business outlook, cash flow growth and overall financial profile;*

- *WPZ unitholders will benefit from having a general partner, ETE, that, based on the unique intrinsic financial and strategic optionality in the Energy Transfer family, will be in a position to help WPZ fully realize its long-term growth potential; and*

- *WPZ will receive a $428 million break-up fee for the termination of its merger agreement with WMB payable to all outstanding limited partnership units of WPZ including WMB's approximate 60 percent ownership.*

14.     The Press Release also included the following statement:

During the course of its diligence process over the last ten weeks, the Energy Transfer family has identified significant commercial synergies.  These synergies run across a broad spectrum, ranging from new revenue opportunities, improved operational efficiencies and performance, new capital opportunities and prioritization of existing capital projects.  ETE expects that the anticipated EBITDA [*i.e.*, earnings before interest, taxes, depreciation, and amortization] from these commercial synergies **will exceed $2 billion** per year by 2020 (or more than 20% of the estimated current pro forma EBITDA for the combined company) and will require overall incremental capital investment of more than $5 billion to achieve.

(Emphasis added).

15.     In conjunction with the Press Release, ETE management hosted a conference that same day where it reviewed a 24-page investor presentation of ETE and Williams and fielded questions from participants on the call (the "Investor Presentation").  The Investor Presentation was included as a link within the Press Release, and was posted on ETE's and Williams' websites.[3]  Page 20 of the Investor Presentation specifically stated the projected commercial synergies of **greater than $2 billion of EBITDA by 2020**.  In addition, on November 17, 2015, ETE published "Williams Commercial Revenue Synergy Opportunities" (the "Synergy

---

[3]  A true copy of that Investor Presentation is attached as Exhibit 2.

Publication").  [4]This also presented on page 3 of 8 the $**2 billion** in synergies and a partial breakout of its components.

16.     The Press Release, Investor Presentation, and the Synergy Publication were each "group published documents" as defined in *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1253 (10th Cir. 1997).

17.     On information and belief, Williams and ETE, through one or more of each of their executive officers, and one or more of the directors on Williams' strategic review committee, made or approved the statement in the Press Release and the Investor Presentation, asserting **in excess of $2 billion** in synergies, and one or more of Williams' and ETE's executive officers, and one or more of the directors on Williams' strategic review committee, had actual knowledge that the Press Release and Investor Publication contained false or misleading statements as alleged hereafter, and that the statement in each  concerning **in excess of $2 billion** in synergies was false or misleading.  On information and belief, ETE, through one or more of its executive officers, created the Synergy Publication, and the statement of **$2 billion in EBITDA and the** breakout of that figure therein, and one or more of ETE's executive officers had actual knowledge that the Synergy Publication contained false or misleading statements as hereafter alleged, and that its statement concerning **$2 billion** in synergies was false or misleading.

18.     Of the 22 bullet points listed above as potential benefits of the merger, several derive their value from the projected commercial synergies said to be **in excess of $2 billion**. This estimate is materially overstated, and known by Defendants to be such.  When the projected commercial synergies are eliminated or adjusted lower to account for factual errors, the suggested value to Williams' shareholders is materially overstated.

---
[4]  A true copy of the Synergy Publication is attached as Exhibit 3.

19.     One of the larger elements in the **$2 billion misrepresentation** is the projected uplift to EBITDA from commercial synergies in the Northeast liquids business of the combined companies.  Williams/ETE claim they can divert 200-300 thousand barrels per day ("BPD") of natural gas liquids ("NGL") volumes with ethane rejection, and up to 500 thousand BPD with full ethane recovery, onto pipelines operated by ETE (and its affiliates), while potentially base-loading a new project with NGL volumes currently controlled by Williams.  This assumption, which accounts for $350 - $850 million of the projected **$2 billion** in commercial synergies, depending on ethane rejection/recovery, is materially overstated by a factor of 10 or more, depending on the purported ability of Williams through WPZ to entice uncontrolled barrels onto ETE pipelines.  Williams Quarterly Data Book, 3rd quarter 2015, page 30, shows that it only produces 113 million gallons or 29 thousand BPD of total NGL in the Northeast,[5] and WPZ only showed 4 million gallons or 1 thousand BPD of non-ethane equity sales in its 3rd quarter data book, p. 30.[6]  The actual synergistic opportunity for commercial synergies from the NE liquids business is a small fraction of what has been represented.  Moreover, it is unclear **which entity** would receive a benefit, if there ever will be one.  According to the May 13, 2015, Williams' Analyst Day presentation on page C-17, the ethane already flows to Sunoco (ETE) and, therefore, there are only synergies associated with the non-ethane volume.[7]

20.     Within the **$2 billion** misrepresentation is a forecast for $300-$400 million of incremental EBITDA that Williams/ETE is to achieve by diverting 60 thousand BPD[8] of incremental Williams volume in the Rockies region to baseload a new pipeline that connects

---

[5]  A true copy of the Williams Quarterly Data Book, Third Quarter 2015 is attached as Exhibit 4.
[6]  Exhibit 4.
[7]  A true copy of the May 13, 2015 Williams' Analyst Day presentation is attached as Exhibit 5.
[8] Jamie Welch, CFO of ETE.

with ETE's Godley processing plant and Mont Belvieu.  This is not probable or even possible.
The Williams Quarterly Data Book, 3rd quarter 2015,[9] page 34, shows that WPZ West only has
79 million gallons or 20.5 thousand BPD of NGL equity sales.  Further, the liquids from WPZ's
Rockies plants already have access to Williams' Conway and OneOk's Bushton fractionator and
market spreads between Conway and Mont Belvieu are less than 8 cents per gallon (per Oil Price
Information Service reports) for all products rather than the unsupported and hypothetical, non-
market related $0.15 per gallon incorporated into the $300-$400 million uplift projected by
Williams/ETE in presentations to analysts and institutional investors.[10]  Not only are the
estimates from Williams/ETE for this project factually overstated, the project is not
economically viable using the actual volumes available from Williams, and the current market
rate.  Therefore, this entire $300-$400 million synergistic benefit to shareholders is a fake and
known to be false.  Moreover, it is unclear **which entity** would receive a benefit, if there ever
will be one.

      21.     A third knowing element of the **$2 billion** misrepresentation is reflected in
guidance from Williams/ETE for projections of $250 million in incremental EBITDA from
bringing compression services in-house following the business combination.[11]  In reality,
Williams already benefits from captive compression due to its acquisition of Access in 2014.  In
fact, the benefit of captive compression is mostly reflected in the ongoing economics of WPZ's
business, so there is virtually zero synergistic opportunity for additional incremental EBITDA.

---

[9]  Exhibit 4.
[10]  Jamie Welch, CFO of ETE.
[11]  Exhibit 6, Wells Fargo Securities, "Equity Research – Energy Transfer Equity, L.P.," p. 2 at "(2)" (based on company guidance).

A further element in the **$2 billion** misrepresentation is that another $160 million of EBITDA could be generated by connecting ETE's Transwestern system with WPZ's Northwest Pipeline system ("NWPL"), and adding bi-directional capability to the network.[12]   There is a blatant omission in this representation because the pipes are already connected via piping at the outlet of various processing plants in the San Juan Basin.  Moreover, NWPL is already fully subscribed by existing customers for an average remaining life of 9 years according to the May 13, 2015 Williams' Analyst Day package on page E-9.[13]  Virtually all of the $160 million in EBITDA ascribed to this "synergistic" idea is unattainable or would be enjoyed by NWPL shippers who hold/control the capacity. Additional Press Release and Other Misrepresentations

22.     The first bullet point under the heading of potential benefits to WPZ shareholders states, "There is no expected impact to WPZ's credit ratings as a result of the ETE/Williams combination."  In fact, on the very same day as the merger announcement, Fitch Ratings Service downgraded the rating outlook for WPZ to negative. (Source: Bloomberg).[14]

23.     The executive officers at ETE knew of this likely outcome for the WPZ credit rating when they included the statement above in the merger press release.  For example, on page 11 of the transcript of the conference call conducted on the afternoon of the merger announcement, ETE CFO, Jamie Welch, is quoted saying, "We spent a lot of time, Kelcy and I, with the rating agencies talking between ourselves and John McReynolds about what we thought made sense."[15]  ("Kelcy" is Kelcy Warren, Chairman of the Board of ETE.)

---

[12]  Exhibit 6, p. 2 at "(3)" (based on company guidance).
[13]  Exhibit 5.
[14]  Exhibit 7.
[15]  Exhibit 8, p. 11.

24.     The second bullet point under potential benefits for WPZ stakeholders quoted above lists potential cost savings and synergies of up to $400 million per annum with WPZ joining the Energy Transfer shared service model.  This claim is a misrepresentation because WPZ stakeholders would only receive 50% of any benefit from cost savings due to the incentive distribution right ("IDR") obligation to ETE from WPZ.  It is worth noting that an estimate of $400 million in cost savings from WPZ looks extremely aggressive considering the entire run-rate for annual Selling, General and Administrative ("SG&A") expenses for WPZ was $530.7 million as of September 30, 2015. (Source: Bloomberg).[16]

25.     Finally, on December 9, 2015, Mr. Welch, CFO of ETE, participated in an interview broadcast live on the national television network, CNBC, with the reporter David Faber.  In the interview, Mr. Welch stated:[17]

> Look, a lot of people have talked about whether, in fact, the whole MLP structure is under attack.  I think the anomaly is with Kinder Morgan, which has more elevated leverage than many of the other peers in the sector.  We run our business at around 4.5x debt to EBITDA.  That is sacrosanct.  It's set in stone.  You cannot move it.  You can have a little bit of deviation, but, by and large, that's where you need to run it.

This was a material misrepresentation of ETE's net debt to EBITDA, which, as shown in Bloomberg as of September 30, 2015, was 8.15,[18] and for ETP the ratio was 6.35.[19]  Mr. Welch in the interview misrepresented the elevated leverage of ETE.

### Misrepresentations in the S-4 Registration Statement

26.     On November 24, 2015 a draft Form S-4 Registration Statement was filed with the Securities Exchange Commission by ETE and Williams (the "S-4").   The S-4 states that

---

[16] Exhibit 9.
[17] Exhibit 10.
[18] Exhibit 11.
[19] Exhibit 12.

synergies will "**exceed $2 billion**."[20]  This is a material misrepresentation as shown above.  It was made by Williams and ETE, or by ETE, and Williams aided and abetted its publication in the S-4.

27.     A pre-effective amendment to the S-4 was filed on January 12, 2016 (the "Amendment").  The S-4[21] and the Amendment[22] contain a pro forma financial table for ETC incorporating certain of the synergy information.  However, in the Amendment the following statement has been added concerning the table:[23]

> HOWEVER, WMB BELIEVES THAT THE ABOVE PROSPECTIVE FINANCIAL INFORMATION IS NO LONGER VALID BECAUSE IT WAS PREPARED SEVERAL MONTHS PRIOR TO THE DATE OF THIS PROXY STATEMENT/PROSPECTUS, AND SINCE SUCH TIME THE INDUSTRY IN WHICH WMB AND ETE OPERATE HAS BEEN UNDER PRESSURE AS A RESULT OF LOWER COMMODITY PRICES AND HIGHER COSTS OF CAPITAL. SEE THE SECTION TITLED "SUMMARY – RECENT DEVELOPMENTS."

This is essentially an admission by Williams of the misrepresentation of "**in excess of $2 billion in annual synergies**" that was made on September 28, 2015 in the Press Release published in the *Tulsa World* and on web links, and repeated in the S-4, but it does not clearly and entirely correct the misrepresentation.

28.     The S-4 has a material omission concerning matters apparently not disclosed to the Williams Board of Directors prior to their vote and approval of the Proposed Acquisition.  A key ratio considered by directors, officers, stockholders, and their investment advisors in valuing companies that have master limited partnerships like Williams and ETE is cash coverage to distributions, or what is called the distribution coverage ratio.  This is derived from the financial

---

[20] A true and correct copy of page 147 from the S-4 is attached as Exhibit 13.

[21] A true and correct copy of page 146 from the S-4 is attached as Exhibit 14.

[22] A true and correct copy of page 147 from the Amendment is attached as Exhibit 15.

[23]  Exhibit 15.

reports of a company, and is a comparison of distributable cash flow relative to actual cash distributions to shareholders or unit holders.  A ratio of 1.0 or greater is considered to be sustainable, and an ongoing ratio of less than 1.0 is recognized by market participants as indicating that distributions may be unsustainable.  A press release dated August 5, 2015 of Energy Transfer Partners L.P. ("ETP"), the major limited partnership supporting ETE, reported its Second Quarter results, and disclosed a distribution coverage ratio of 1.03.[24]  This was the distribution coverage ratio available for the September 28, 2015 vote of the Williams' Board of Directors in favor of the Proposed Acquisition.  The financial results of ETP for the Third Quarter were not released until November 4, 2015.  A press release as of that date reported that there was a reversal from the second quarter of a 2015 tax benefit that had favorably affected the Second Quarter reported results by $79 million.[25]  Had that benefit not been considered in the Second Quarter results, the distribution coverage ratio would have been 0.94, which by existing financial guidelines and experience would have mandated substantial deliberation and consideration with disclosures pertaining thereto.  Despite this current information nothing is presented in the S-4 on this matter.

29.      The S-4 and the Amendment are "group published documents" by ETE and Williams.  On information and belief, Williams and ETE, through one or more of each of their executive officers, and one or more of the directors on Williams' strategic review committee, made or approved the S-4, and one or more of Williams' and ETE's executive officers, and one or more of the directors on Williams' strategic review committee, had actual knowledge that the S-4 contained false or misleading statements as alleged hereinabove.

---

[24] A true and correct copy of the August 5, 2015 press release of ETP is attached as Exhibit 16.
[25] A true and correct copy of the November 4, 2015 press release of ETP is attached as Exhibit 17.

30.     Each of the above misrepresentations and omissions is of a character that a reasonable stockholder would consider it important in deciding how to vote.  The misrepresentations and omissions alleged above violate Section 14 of the 1934 Securities Exchange Act.

31.     The dissemination of proxy materials and the conduct of a special shareholders' meeting of Williams are essential links in accomplishing the proposed merger.

32.     The proposed merger of Williams with ETC, the dissemination of proxy materials and the conduct of a special shareholders' meeting of Williams should be preliminarily and permanently enjoined.

## Irreparable Harm to Williams' Shareholders

33.     Upon information and belief, the shareholders of Williams and the investing public are being irreparably injured and harmed by Defendants' conduct in an amount that cannot be calculated and compensated for by money damages, in that, inter alia:

A.     The Williams corporate entity will not survive the proposed transaction and will, in fact, disappear through a merger.

B.     Williams shareholders presently are compelled to make investment decisions concerning their Williams stock without the benefit of proper material information that Defendants are required by law to provide.

C.     Defendants' unlawful conduct has resulted in confusion and misunderstanding on the part of shareholders and the general public as to the true intentions of Defendants.

16

D.      The widespread confusion and uncertainty created by Defendants' false and misleading statements will continue to cause serious dislocations in the market for Williams' stock and the operations of Williams' business.

## Likelihood of Success

34.     There is a strong likelihood of success on the merits in this action.  As shown above, there are multiple misrepresentations and omissions, any one of which would qualify for a violation of Section 14 of the 1934 Securities Exchange Act.  Moreover, the misrepresentations and omissions are borne out by existing disclosures of fact that are virtually irrefutable.

35.     Moreover, there are sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips decidedly toward the Plaintiff, who represents all stockholders of Williams that confront the impairments alleged in    ¶ 33, *supra*.

## Balance of Equities

36.     Further, the balance of equities tip in favor of the Plaintiff.  Plaintiff is a single stockholder, though his claim is representative of that of all stockholders of Williams, each of whom are victims of the vast power of the corporate machinery of Williams and ETE, and of Williams' directors, who appear to have fallen out of touch with reality, and who relied on investment bankers who have much to gain from the execution of the Proposed Acquisition as shown in their conflict disclosures.  It is far better for this Court to act to protect the interests of the individual shareholders than to join in the corporate chicanery in the Proposed Acquisition.

## Public Interest

37.      Finally, an injunction will clearly serve the public interest by speaking to shareholders' rights to correct and complete information and preserving a strong competitor

within the industrial sectors in which Williams participates, as opposed to creating a large combined company.  Further, the price offered for the Williams stock is lower by over two thirds from the implied amount of the initial offer by ETE, which was rejected by the Williams Board of Directors as being inadequate.  Finally, the Proposed Acquisition lacks a premium, and rather than allocate the value of Williams to its highest use, it transfers ownership of Williams for inadequate consideration.

## Class Action Allegations

38.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other public stockholders of Williams as of September 28, 2015, and thereafter (the "Class").  Excluded from the Class is any individual or entity affiliated with either Defendant.

39.     This action is properly maintainable as a class action.

40.     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, there were more than 749 million shares of Williams' common stock outstanding as of September 25, 2015.

41.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include the following:

(a)     whether the Defendants have violated Section 14 of the Securities Exchange Act by making material misrepresentations or omissions; and

(b)     whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Acquisition consummated.

42.     Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff does not have any interests adverse to the Class.

43.     Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

44.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

45.     Defendants have acted, or failed to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT 1

46.     Defendants' material misrepresentations and omissions alleged above are in violation of Section 14 of the 1934 Securities Exchange Act, 15 U.S.C. § 78n, and warrant the issuance of a preliminary and a permanent injunction.

47.     The Defendants knew that the representations and omissions as alleged herein were untrue.  The Defendants directly, and aiding, or abetting and materially assisting each other, made such misrepresentations and omissions with the intent and purpose of deceiving the Plaintiff, and other Williams' stockholders.

48.     Defendants accomplished the acts constituting the false representations by the use of the means and instrumentalities of interstate commerce including, but not limited to, the United States Mails and interstate telephone and internet facilities.

49.     The foregoing acts, misrepresentations and omissions constitute a common plan, scheme and conspiracy to violate the federal securities laws in which the Defendants materially

participated.  Accordingly, all of the acts in furtherance of the scheme are attributable to each of the Defendants, regardless of which particular Defendant was the actor.

50.     In the alternative, and without limiting the other allegations herein, Williams aided, abetted, assisted and materially participated in the acts, representations and omissions alleged herein

WHEREFORE, Plaintiff, for himself and the Class, respectfully prays for this Court to issue a preliminary and permanent injunction enjoining each of the Defendants from further proceeding with a proposed merger, including the dissemination of proxy materials, and the conduct of a special shareholders' meeting of Williams.

_____s/Laurence L. Pinkerton_____
Laurence L. Pinkerton, Esq. (OBA #7168)
PINKERTON LAW, P.C.
Penthouse Suite
15 E. 5th Street
Tulsa, Oklahoma 74103-4303
(918) 587-1800
(918) 582-2900 - Fax
pf@att.net
Attorney for Plaintiff