## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHN BUMGARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-26-GKF-FHM |
| | ) | |
| THE WILLIAMS COMPANIES, INC., and | ) | |
| ENERGY TRANSFER EQUITY, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is the motion, filed by defendants The Williams Companies, Inc.

("Williams") and Energy Transfer Equity, L.P. ("ETE"), to dismiss the Amended Class Action

Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can

be granted. [Dkt. #21]. Plaintiff John Bumgarner ("Bumgarner") brings this action to enjoin the

defendants from further proceeding with a proposed merger. In his Amended Complaint,

brought for himself and for members of a proposed class of Williams shareholders, Bumgarner

alleges defendants and their representatives made false or misleading statements when soliciting

proxies for the shareholder vote on the proposed merger, in violation of § 14 of the 1934

Securities Exchange Act, 15 U.S.C. § 78n. Defendants move to dismiss, arguing that the

statements fall under a safe harbor for forward-looking statements in 15 U.S.C. § 78u-5(c) and

the Tenth Circuit's "bespeaks caution" doctrine, that the statements are not false or misleading

on their face, that Bumgarner failed to plead facts giving rise to a strong inference of scienter,

and that one of the statements was not part of a proxy solicitation.

## I.   Standard of Review

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine

whether the plaintiff has stated a claim upon which relief can be granted.  A complaint must

contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  The plausibility requirement "does not impose a

probability requirement at the pleading stage; it simply calls for enough facts to raise a

reasonable expectation that discovery will reveal evidence" of the conduct necessary to make out

the claim.  *Id.* at 556.  "[A] plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  *Id.* at 555 (quotations omitted).  The court "must determine whether

the complaint sufficiently alleges facts supporting all the elements necessary to establish an

entitlement to relief under the legal theory proposed."  *Lane v. Simon*, 495 F.3d 1182, 1186 (10th

Cir. 2007).

## II.   Elements of Section 14(a) Claim

Section 14(a) of the Securities and Exchange Act forbids proxy solicitations that

contravene the rules and regulations of the Securities and Exchange Commission ("SEC").  15

U.S.C. § 78n(a)(1).  One of those rules, Rule 14a-9, prohibits proxy solicitations by means of any

communication containing false or misleading statements or omissions that are material to the

proxy solicitation.  17 C.F.R. § 240.14a-9.  A plaintiff claiming a violation of § 14(a) by way of

Rule 14a-9 must establish three elements: (1) the proxy statement contained a material

misrepresentation or omission; (2) the defendant acted with the requisite state of mind; and (3)

the proxy statement was the essential link in completing the transaction at issue.  *See In re Zagg*

*Securities Litigation*, 2014 WL 505152, \*7 (D. Utah 2014) ("*Zagg I*"); *see also Lane v. Page*, 581 F.Supp.2d 1094, 1111 (D.N.M. 2008).

The parties disagree as to the state of mind required by the second element. The disagreement matters because if plaintiff must prove defendants acted with a particular state of mind, the Private Securities Litigation Reform Act ("PLSRA") establishes a heightened pleading requirement. *See* 15 U.S.C. § 78u-4(b)(2)(A). For claims based on § 10(b) and Rule 10b-5, which prohibit securities fraud, a plaintiff must prove the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *In re Zagg Securities Litigation*, 797 F.3d 1194, 1200 (10th Cir. 2015) ("*Zagg II*"); *see also* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5; *In re Level 3 Comm., Inc. Securities*, 667 F.3d 1331, 1339 (10th Cir. 2012). To survive a motion to dismiss, the plaintiff "must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) (emphasis in original). The parties' specific disagreement is whether the PSLRA's heightened pleading requirement applies to claims arising under § 14(a). Plaintiff argues the heightened pleading requirement does not apply because § 14(a) claims may be based in negligence. However, when a plaintiff asserts a § 14(a) claim grounded in alleged fraudulent conduct, he "must meet the heightened scienter pleading requirement" of the PSLRA.[1] *Zagg I* at \*7; *Police & Fire Ret. Sys. v. Safe Net, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009).

---

[1] The Circuits do not entirely agree on this question. *See S.E.C. v. Das*, 723 F.3d 943, 953 & n. 6 (8th Cir. 2013) (citing cases). The Tenth Circuit has not yet addressed whether the PSLRA applies to § 14(a) claims. *See Lane*, 581 F.Supp.2d at 1107-08. Other Circuits have applied the PSLRA's heightened pleading requirement to § 14(a) claims, at least when those claims "are based on allegations of fraud." *Id.* at 1108; *see also DeKalb Cty. Pension Fund v. Transocean Ltd.*, 2016 WL 1055363, \*8, n. 88 (2d Cir. 2016). Here, plaintiff's claim is based on allegations of fraud, not negligence. [*See* Dkt. #7, pp. 19-20 ("The Defendants knew that the representations and omissions as alleged herein were untrue. The Defendants directly, and aiding, or abetting and materially assisting each other, made such misrepresentations and omissions with the intent and purpose of deceiving the Plaintiff, and other Williams' stockholders. . . . [Defendants'] acts, misrepresentations and omissions constitute a common plan, scheme and conspiracy to violate the federal securities laws . . . .")]. However, the disposition of the current motion does not require the court to resolve this question.

### III.     The Alleged Misrepresentations

####      A.     *Forward-Looking Statements*

The Amended Complaint references eight statements or omissions.  Six of the statements

are "forward-looking" statements regarding the expected effects of the proposed merger.

Bumgarner alleges defendants stated the proposed merger was expected to produce more

than $2 billion in revenue, specifically EBITDA (earnings before interest, taxes, depreciation,

and amortization).  [Dkt. #7, ¶¶ 11-25].   Bumgarner alleges defendants included this

statement—and statements concerning specific, component synergies included in the $2 billion

total—in a press release[2] announcing the proposed merger ("the press release"), in an investor

presentation delivered in conjunction with the press release ("the investor presentation"), in a

subsequent publication titled "Williams Commercial Revenue Synergy Opportunities" ("the

Synergy publication"), and in a draft S-4[3] registration statement defendants filed with the SEC.

Bumgarner alleges at least some of defendants' executive officers, and "one or more of the

directors on Williams' strategic review committee, had actual knowledge that these statements

were false and misleading[.]"  [*Id.* at 9].

Bumgarner alleges Williams' credit outlook was downgraded to negative on the day the

proposed merger was announced.  [*Id.* at 12].  Bumgarner also alleges defendants stated in the

press release that the merger was not expected to impact defendant Williams's credit rating, and

that ETE's executive officers, who had claimed to have discussed the proposed merger with the

---

[2] The press release and other documents containing the alleged misrepresentations were incorporated into the Amended Complaint by reference, and thus the court may consider the contents of those documents when ruling on defendants' Motion to Dismiss.  *See In re Gold Res. Corp Sec. Lit.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

[3] Bumgarner alleges Williams later amended the S-4 to include a disclaimer, stating that the prospective financial information was "no longer valid" due to intervening changes in the economy resulting in "lower commodity prices and higher costs of capital."  [Dkt. #7, p. 14].  Bumgarner alleges that the amendment was an admission that the prior $2 billion estimate was a misrepresentation, and that the amendment did not "clearly and entirely correct the misrepresentation."  [*Id.*].

credit reporting agencies, knew their statement that there would be no credit impact was not true. [*Id.*].

Bumgarner alleges defendants stated in the press release Williams shareholders would have "synergies of up to $400 million per annum" as a result of the proposed merger. Bumgarner alleges this statement was a misrepresentation because, under the terms of the proposed merger, any cost savings would be shared equally between ETE and Williams shareholders and because the estimate was unrealistic given that the $400 million in synergies would have to come out of a total of $530.7 million of expenses.

Defendants invoke 15 U.S.C. § 78u-5, a statutory "safe harbor."[4]  Under § 78u-5, a forward-looking statement cannot be a basis for liability if it is identified as a forward-looking statement and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[.]"  § 78u-5(c)(1)(A)(i).  Such "meaningful cautionary statements" must warn of "important factors that could cause actual results to differ . . . ."  *In re Harman Intern. Ind., Inc.*, 791 F.3d 90, 103 (D.C. Cir. 2015).  However, the cautionary language need not mention all factors that could alter anticipated results, or even the specific factor that "ultimately belies a forward-looking statement."  *Id.* (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)).  Rather, the language must put an investor sufficiently "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  *Id.*

Bumgarner argues the safe harbor does not apply when a forward-looking statement is made with actual knowledge that the statement was false or misleading, citing two cases in

---

[4] The statutory safe harbor, like the "bespeaks caution" doctrine codified therein, may be properly applied at the motion to dismiss stage.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 n. 7 (10th Cir. 1997).

support.  *See Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213 (D. Colo. 1998); *In re Cigna Corp. Sec. Lit.*, 2006 WL 782431 (E.D. Penn. 2006).  However, these cases mischaracterize the structure of the safe harbor provision.  Section 78u-5 contains several safe harbors for forward-looking statements, including statements for which a plaintiff has failed to prove actual knowledge that the statement was false or misleading.  § 78u-5(c)(1)(B).  The various safe harbors are listed disjunctively, and operate independently of each other.  Accordingly, a forward-looking statement identified as such and accompanied by meaningful cautionary statements qualifies for the protection of the safe harbor *regardless* of the state of mind of the individual making or approving the statement.  *See In re Cutera Sec. Lit.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."); *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2nd Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.") (emphasis in original); *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) ("if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."); *Harris*, 182 F.3d at 803; *In re Gold Res. Corp. Sec. Lit.*, 957 F. Supp. 2d 1284, 1294 (D. Colo. 2013) ("even if the defendants made a forward-looking statement with knowledge of its false or misleading nature, that forward-looking statements is still protected if it is . . . 'accompanied by meaningful cautionary statements . . . .'") (quoting § 78u-5(c)(1)(A)(ii))

(emphasis in original)); *In re Splash Tech. Holdings, Inc. Sec. Lit.*, 2000 WL 1727377, *8 n. 6

(N.D. Cal. 2000).  With due respect to the *Schaffer* and *In re Cigna* courts, their interpretation is

inconsistent with the plain language of the statute.  A House Conference Report regarding the

safe harbor statute supports this conclusion.  *See* H.R. CONF. REP. 104-369 ("The first prong of

the safe harbor requires courts to examine only the cautionary statement accompanying the

forward-looking statement.  Courts should not examine the state of mind of the person making

the statement.").

The press release, investor presentation, Synergy publication, and draft S-4 identify

forward-looking statements, *inter alia*, by the use of the words "anticipate," "expects," "will,"

"potential," and "variations or similar expressions."  [Dkt. #21-2, pp. 4-5 (press release); Dkt. #8,

p. 10 (investor presentation), p. 35 (Synergy publication); Dkt. #21-3, p. 92 (draft S-4)].  The

statements Bumgarner alleges to be misrepresentations in these documents, with one exception,

contain one of those words.  [Dkt. #21-2, at 2 ("synergies . . . *will* exceed $2 billion per year by

2020 . . . ."), at 3 ("There is no *expected* impact to WPZ's credit ratings . . . . WPZ unitholders

*will* have . . . synergies of up to $400 million per annum . . . ."); Dkt. #8, p. 28 ("WELL OVER

$2 BILLION *POTENTIAL* EBIDTA FROM COMMERCIAL SYNERGIES"); Dkt. #11, p. 49

("ETE *expects* that the *anticipated* EBIDTA from these commercial synergies *will* exceed $2

billion per year by 2020 . . . .") (all emphases added)].  The statement in the Synergy publication

does not contain one of the identifier words, but is clearly an estimate of future earnings—

"~2.0BN OF ADDITIONAL EBIDTA FROM COMMERCIAL SYNERGIES . . ."—especially

considering its inclusion in a presentation titled "Williams Commercial/Revenue Synergy

Opportunities."  [Dkt. #8, pp. 34, 36].  This statement clearly falls within the Synergy

publication's broader definition used to identify "forward-looking statements," which includes

"statements regarding the merger of ETE and Williams, the expected future performance of the

combined company . . . , and the combined company's future financial condition, operating

results, strategy and plans."  [*Id.* at 35].

The press release, the investor presentation, and the Synergy publication each list the

same factors that could "cause actual results to differ materially from those described in [any of]

the forward-looking statements."  [Dkt. #21-2, p. 5; Dkt. #8, p. 10, 35].  The factors listed

include:

> (2) the ultimate outcome and results of integrating the operations of ETE and Williams, the ultimate outcome of ETE's operating strategy applied to Williams and the ultimate ability to realize cost savings and synergies; (3) the effects of the business combination transaction of ETE, ETC and Williams, including the combined company's future financial condition, operating results, strategy and plans;. . . (5) the reaction of the companies' stockholders, customers, employees and counterparties to the proposed transaction; . . . (7) unpredictable economic conditions in the United States and other markets, including fluctuations in the market price of ETE common units and ETC common shares; . . . and (9) the ability to maintain Williams', WPZ's, ETP's, SXL's and SUN's current credit ratings.

The draft S-4 contains a longer list of factors, including:

- the potential impact of the announcement or consummation of the merger on relationships, including with employees, suppliers, customers, competitors and credit rating agencies;
- the ultimate outcome and results of integrating the operations of ETE and WMB and the ultimate ability for ETC, ETE and the ETE Entities to realize synergies;
- the effects of the merger of ETC's and WMB's businesses, including the combined company's future financial condition, operating results, strategy and plans;
- ETC's ability to pay distributions on the common shares;
- ETC's expected receipt of, and amounts of, distributions from ETE, and ETE's expected receipt of, and amounts of, distributions from ETP, SXL and Sunoco;
- the volumes transported on the pipelines and gathering systems of ETE's subsidiaries;
- the prices and market demand for, and the relationship between, natural gas, NGLs and oil;
- energy prices generally;
- the general level of petroleum product demand and the availability and price of NGL supplies;
- the level of domestic natural gas, NGL and oil production, imports and exports;
- governmental regulation and taxation;

In response to the Motion to Dismiss, Bumgarner does not argue that these are not

"meaningful cautionary statements."  The factors identified, especially those regarding the

combined entities' "ability . . . to realize synergies" and the merger's "impact . . . on

relationships . . . with . . . credit rating agencies," address the issues raised in the six forward-looking statements. The court concludes these statements are covered by § 78u-5's safe harbor.

       *B.      Welch's CNBC Interview*

Bumgarner also alleges ETE's CFO, Jamie Welch, claimed in a television interview on CNBC that ETE carries around 4.5 times its earnings—again, EBITDA—in debt, when in fact, ETE carries 8.15 times EBITDA in debt and Energy Transfer Partners ("ETP"), another partnership in ETE's corporate family, carries 6.35 times EBITDA in debt. [*See* Dkt. #11, p. 41].

Defendants argue § 14(a), invoked in the Amended Complaint, only applies to proxy solicitation statements, and that Welch's statement was not a proxy solicitation. In response, Bumgarner argues Welch's statement violated § 14(e), which prohibits false or misleading statements "in connection with" tender offers. In reply, defendants argue § 14(e) is inapplicable because no tender offer has been proposed as part of the proposed merger. Defendant's argument that § 14(e) applies only to tender offers is persuasive and consistent with the plain language of that subsection. Thus, in order for the Amended Complaint to adequately state a violation of § 14 based on Welch's statement, the statement must amount to a proxy solicitation.

The terms "solicit" and "solicitation" include:

> (i) Any request for a proxy whether or not accompanied by or included in a form of proxy[;]
> (ii) Any request to execute or not to execute, or to revoke, a proxy; or
> (iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.

17 C.F.R. § 240.14a-1(l). In the interview, Welch referenced the proposed merger twice, but never requested a proxy. Nor were his statements "reasonably calculated to result in the

9

procurement, withholding or revocation of a proxy."[5]  Welch's statements regarding, *inter alia*,

ETE's leverage might have been of interest to shareholders considering how to respond to a

proxy solicitation in connection with the proposed merger, but Bumgarner does not allege or

argue that Welch's statements amount to a proxy solicitation under § 14(a).

C.      *Distributable Coverage Ratio in the S-4*

Finally, Bumgarner alleges the S-4 registration statement contains a material omission

because it fails to address an error in an ETP press release that shortly preceded the vote of the

Williams board of directors in favor of the proposed merger on September 28, 2015.  Bumgarner

alleges the ETP press release, dated August 5, 2015, overestimated ETP's "distribution coverage

ratio," which is the ratio of a company's distributable cash flow to the actual distributions made

to shareholders.  Bumgarner alleges a subsequent ETP press release dated November 4, 2015

explained that a tax benefit ETP had relied on when calculating its distribution coverage ratio in

the August 5, 2015 press release had been reversed.  As a result, Bumgarner alleges, the

distribution coverage ratio should have been .97, as opposed to 1.03, the ratio announced in the

August 5, 2015 press release.  This change is material, Bumgarner alleges, because investors

consider a distribution coverage ratio at or above 1.0 to be sustainable, but a ratio of less than 1.0

is not considered sustainable.  As a result, Bumgarner alleges the S-4 registration statement,

which has not been amended to address the adjustment in the distribution coverage ratio,

contains a material omission.

Defendants argue that the S-4 is not false or misleading simply because it has not been

amended to reflect new information.  Defendants' argument is persuasive.  A misrepresentation

---

[5] Section § 240.14a-1's definition of "solicit" and "solicitation" specifically excludes statements made in broadcast media by a "security holder who does not otherwise engage in a proxy solicitation."  § 240.14a-1(l)(2)(iv)(A). The parties do not address whether this exclusion would apply to Welch.

is immaterial if it would not be viewed by a "reasonable investor as having significantly altered the total mix of information" available to stockholders. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2413 (2014) (internal quotations omitted). The November 4, 2015 press release was a public statement to which Williams' shareholders have access. The shareholders may consider the implications of the information contained therein for ETE's distribution coverage ratio. The failure to amend the S-4 to reflect the information in the November 4, 2015 press release does not constitute a material omission that could support a claim under § 14(a).

## IV.    Conclusion

For the foregoing reasons, none of the statements or omissions referenced in the Amended Complaint as being false or misleading can support a claim for a violation of § 14. In no way should this order be taken as approval or disapproval of the proposed merger, or of the wisdom of acceptance or rejection by the shareholders.

WHEREFORE, defendants' Motion to Dismiss the Amended Complaint for failure to state a claim [Dkt. #21] is granted.

IT IS SO ORDERED this 28th day of April, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT