**IN THE UNITED STATE DISTRICT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) JOHN BUMGARNER,<br><br>Plaintiff,<br><br>v.<br><br>2) THE WILLIAMS COMPANIES, INC., and<br>3) ENERGY TRANSFER EQUITY, L.P.,<br><br>Defendants. | ) | Case No. 16-cv-26-GKF-TLW |

**THIRD AMENDED CLASS ACTION COMPLAINT**

Plaintiff, John Bumgarner, for himself and members of the Class, alleges:

**Nature of the Action**

1. This is a shareholder class action brought by Plaintiff on behalf of the public shareholders of The Williams Companies, Inc. ("Williams" or "WMB") against Williams and Energy Transfer Equity, L.P. ("ETE"). The action is to enjoin the Defendants from further proceeding with a proposed merger, including the dissemination of proxy materials, and the conduct of a special shareholders' meeting of Williams until they properly correct the mix of information available to Williams' shareholders to exercise their vote on the merger by clearly and truthfully disclosing how the misstatement of over $2 billion in annual EBITDA from "synergies" addressed herein occurred, and what caused its reduction. The merger, including the dissemination of proxy materials, and the conduct of a special shareholders' meeting of Williams are herein referred to as the "Proposed Acquisition".[1]

[1] The Proposed Acquisition is the subject of six complaints filed in the Chancery Court of Delaware:
*Scott Ozaki v. Alan S. Armstrong, et al*., Case No. 11574;
*Richard Greenwald, et al., v. The Williams Companies, Inc., et al.*, Case No. 11573;
*Allison Blystone v. The Williams Companies, Inc., et al.*, Case No. 11601;
*Ira Glener, et al., v. The Williams Companies, Inc., et al.*, Case No. 11606;

**The Parties**

2. Plaintiff is and has been a stockholder of Williams and Williams Partners, L.P. ("WPZ") at all times relevant hereto.

3. Williams is a Delaware corporation with principal executive offices at One Williams Center, Tulsa, Oklahoma. Williams is primarily an energy infrastructure company focused on connecting North America's significant hydrocarbon resource to growing markets for natural gas, natural gas liquids, and olefins. As of December 31, 2014, Williams' interstate gas pipelines, midstream, and olefins production interests were largely held through their investments in Williams Partners L.P. and Access Mid-Stream Partners, L.P. ("Access"). On February 2, 2015, Williams completed the merger of the two previously stated master limited partnerships. The merged partnership is named Williams Partners L.P. ("WPZ"), and following the merger, Williams owns approximately 60% of the merged partnership, including the general partner interest and incentive distribution rights. As of February 1, 2015, Williams had approximately 6,742 full time employees, a large number of whom live in Tulsa, Oklahoma. Upon completion of the Proposed Acquisition, Williams will be merged with and into Energy Transfer Corp LP ("ETC"), and cease its separate corporate existence.

---

*Larry Amaitis v. Alan S. Armstrong, et al.*, Case No. 11809; and
*State-Boston Retirement System, et al., v. Alan S. Armstrong, et. al.*, Case No. 11844.

Each of these cases alleges multiple breaches of fiduciary duties by the members of the Board of Directors of Williams. Because of the Williams' By-laws, these actions have been forced into Delaware, and have largely gone unreported in Oklahoma.

In addition, Williams has sued ETE in Delaware to unwind a convertible preferred security adopted by ETE and alleged in the lawsuit to be in violation of the merger agreement. Williams has also sued Kelsey Warren, the Chairman of the Board of ETE, in Dallas, Texas, for his role in the issuance of the convertible preferred security which is alleged to be a tortious interference with the merger agreement.

Another case, *City of Birmingham Retirement and Relief System v. Alan S. Armstrong, et al.,* Case No. 16-cv-00017, was filed in the United States District Court of Delaware, which alleged violation of Section 14 of the Securities Exchange Act of 1934 and breaches of fiduciary duties by officers and directors of Williams. It has been voluntarily dismissed.

4. The equity securities in ETC that Williams' shareholders will receive under the Proposed Acquisition will be in a new, previously untraded entity which will be diluted by 10% at closing. Ownership in ETC has many bad financial characteristics as compared to ownership in Williams stock:

A. Shareholders of ETC have no authority to elect or remove members of the board of directors that governs its business.

B. ETC is governed by a board of directors whose members are selected by one individual, Kelcy Warren, who also serves as chairman of the board.

C. The board that governs ETC is held to a lesser standard of fiduciary duty relative to a typical corporation.

D. There are inherent conflicts of interest between ETE shareholders, including Kelcy Warren, and ETC shareholders.

E. ETC shareholders are powerless to prevent ETE from taking actions that benefit ETE shareholders at the expense of ETC shareholders because of the poor governance structure of ETC. For example, (1) on April 18, 2016, ETE announced its forecast that no cash distributions will be paid on the common units of ETE or ETC for two years following the merger; and (2) through ETE's control, ETE has announced a 2016 Long Term Incentive Plan that will make awards to ETE's employees or general partner, but the 10% dilution cost will be borne solely by ETC unit holders who will be the former Williams shareholders.

5. Defendant ETE is a Delaware limited partnership with principal executive offices at 3738 Oak Lawn Avenue, Dallas, Texas. Its officers and agents purposefully initiated and directed activity within Oklahoma to achieve an acquisition of Williams, including making numerous jurisdictional contacts with the state by telephone, letters and email, requesting due

diligence information from Oklahoma sources, and availing itself of the laws of Oklahoma, *e.g.*, common law fraud with respect to representations made by Williams. These acts have caused and threaten injury within Oklahoma.

6. Upon completion of the Proposed Acquisition, ETC will contribute to ETE all of the assets and liabilities of Williams in exchange for the issuance by ETE to ETC of a number of ETE's Class E common units equal to the number of ETC's common shares issued to Williams stockholders in the Proposed Acquisition. Also in connection with the Proposed Acquisition, ETE will subscribe for a number of ETC's common shares at the transaction price, in exchange for the amount of cash needed by ETC to fund the cash portion of the proposed consideration. As a result, defendant ETE will own a percentage of ETC's outstanding common shares upon completion of the Proposed Acquisition that has changed since the initial announcement. ETE is a provider of services to producers and consumers of natural gas, natural gas liquids, crude oil, and refined products. ETE currently holds approximately 71,000 miles of natural gas, natural gas liquids, refined products, and crude oil pipelines today.

**Jurisdiction and Venue**

7. This Court has subject matter jurisdiction over this action by virtue of Section 27 of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a *et seq*. (the "Exchange Act"). Venue is also proper in this Court by virtue of 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

8. General jurisdiction exists over Williams because it is registered to do business in Oklahoma. Personal jurisdiction exists over ETE because of its alleged actions and contacts directed at Williams in Oklahoma, and its shareholders within Oklahoma. Given ETE's conduct as alleged herein, it is reasonable and fair under the United States Constitution to exert jurisdiction over ETE in this judicial district.

## **Background**

9. Prior to any announcement of the Proposed Acquisition, Williams' common stock closed on June 19, 2015 at $48.34 per share. On the morning of September 28, 2015, Energy Transfer Equity, L.P. (ETE) and Williams announced the Proposed Acquisition valued at approximately $37.7 billion with Williams at $41.69 before the market opened. At the close of stock market trading that same day, Williams' stock dropped -12.1% to $36.56 per share (Source: Bloomberg). It is highly unusual for a company being acquired to see its stock price decline on the day the transaction is announced. It can be noted that the Williams' stock is now down to approximately $19.50. The material decline ($41.60 to $19.50) in the Williams stock price in large part due to the merger announcement demonstrates that Williams shareholders were not offered a normal premium for control of their shares.

10. It is important to note that a takeover premium (*i.e.*, a higher stock price relative to a stock's trading range immediately prior to a merger announcement) is easy for any investor to understand, regardless of training or experience. Conversely, "**other**" merger related opportunities like projected cost savings and who benefits from them, so called potential commercial synergies, and estimates of future growth in earnings or dividends are difficult for investors to evaluate. In the case of this proposed merger, the opportunity for confusion among public investors is much higher than usual because the purported benefits of the transaction are entirely dependent upon "**other**" benefits due to the complete absence of a takeover premium.

## **The Annual $2 Billion EBITDA Misrepresentation**

11. On the day of the Proposed Acquisition announcement, September 28, 2015, Williams and ETE issued a joint press release that described the Proposed Acquisition and purported benefits from it to shareholders of Williams and to stakeholders of WPZ (the "Press

Release").[2] The Press Release was published in the *Tulsa World* and elsewhere, and was posted on ETE's and Williams' websites, the latter of which was hosted in Tulsa, Oklahoma.

12. Certain of the statements in the Press Release, as stated hereafter, were negligent material misrepresentations made jointly by Williams and ETE.

13. The following bullet points are copied verbatim from the Press Release:

*ETE and Williams believe there are numerous meaningful benefits from a proposed combination:*

***ETE Stakeholders***

- *At closing, the transaction will be immediately accretive to distributable cash flow and distributions per unit for ETE and is expected to be credit positive to ETE's credit ratings;*
- *ETE's distribution growth rate is expected to remain at its current level;*
- *as a result of diligence, the size of both the expected cost savings and the anticipated commercial synergies exceeds ETE's previous expectations and will help ensure that the duration of ETE's distribution growth rate will be longer as a result of the transaction;*
- *the introduction of cash into the transaction consideration has reduced the ETC share issuance by over 260 million shares (or approximately 18.5% of the overall ETC share issuance);*
- *the number of possible opportunities to migrate assets within the Energy Transfer family and find additional commercial opportunities, not currently quantified, within the expanded asset base will increase significantly, thereby creating more value for ETP, SXL, WPZ and SUN, which in turn will result in increased cash flow growth for ETE;*
- *the ability of ETE to broaden its overall shareholder base through the ETC structure; and*
- *the creation of ETC will result in increased liquidity for ETE unitholders because of the option for ETE unitholders to exchange ETE common units for ETC common shares.*

[2] A true copy of the press release as published in the *Tulsa World* is attached as Exhibit 1.

**Williams Stakeholders**

*A compelling transaction that provides Williams' stockholders with:*

- *an attractive premium to the implied trading price of WMB assuming WMB traded in line with either the Alerian index or its midstream peers since the date of ETE's initial offer;*
- *a pro forma level of dividend per ETC common shares received that will exceed the 2016 dividend per WMB share that Williams had forecast on a pro forma basis for the Williams/WPZ merger;*
- *ETC dividend growth superior to that of Williams on a pro forma basis for the proposed Williams/WPZ merger;*
- *the option to elect cash in the transaction will allow Williams' stockholders to monetize, on a taxable basis, all or some of their investment in WMB, subject only to the aggregate $6.05 billion pool of cash consideration being fully utilized;*
- *the exchange of WMB shares for ETC common shares is expected to be tax free to WMB stockholders, except with respect to cash received;*
- *for each outstanding ETC common share, ETC will receive from ETE the same cash distribution per quarter as ETE distributes with respect to each ETE common unit;*
- *ETC will benefit from a dividend equalization agreement through calendar 2018 that ensures that ETC shareholders will receive the identical cash dividend as an ETE unitholder;*
- *the CCR is intended to address any trading price differences between ETC and ETE during the two-year period following closing;*
- *ETE will become co-obligor of Williams' existing debt and Williams' credit facility will be terminated at closing; and*
- *ETC common shares are expected to have tremendous liquidity, a strong growth profile and the potential for inclusion in the S&P 500 index (similar to WMB's current inclusion in that index).*

**WPZ Stakeholders**

- *There is no expected impact to WPZ's credit ratings as a result of the ETE/Williams combination;*
- *WPZ unitholders will have greater distributable cash flow from material cost savings and synergies of up to $400 million per annum with WPZ joining the Energy Transfer shared service model;*

- *the combination will create new commercial opportunities for WPZ, including the potential to acquire assets from the overall Energy Transfer group, that will improve WPZ's business outlook, cash flow growth and overall financial profile;*
- *WPZ unitholders will benefit from having a general partner, ETE, that, based on the unique intrinsic financial and strategic optionality in the Energy Transfer family, will be in a position to help WPZ fully realize its long-term growth potential; and*
- *WPZ will receive a $428 million break-up fee for the termination of its merger agreement with WMB payable to all outstanding limited partnership units of WPZ including WMB's approximate 60 percent ownership.*

14. The Press Release also included the following statement:

> During the course of its diligence process over the last ten weeks, the Energy Transfer family has identified significant commercial synergies. These synergies run across a broad spectrum, ranging from new revenue opportunities, improved operational efficiencies and performance, new capital opportunities and prioritization of existing capital projects. **ETE expects that the anticipated EBITDA [*i.e.*, earnings before interest, taxes, depreciation, and amortization] from these commercial synergies will exceed $2 billion *per year* by 2020** (or more than 20% of the estimated current pro forma EBITDA for the combined company) and will require overall incremental capital investment of more than $5 billion to achieve.

(Emphasis added).

15. In conjunction with the Press Release, ETE management hosted a conference that same day where it reviewed a 24-page investor presentation of ETE and Williams and fielded questions from participants on the call (the "Investor Presentation"). The Investor Presentation was included as a link within the Press Release, and was posted on ETE's and Williams' websites.[3] Page 20 of the Investor Presentation specifically stated the projected commercial synergies of **greater than $2 billion *per year* of EBITDA by 2020**. In addition, on November 17, 2015, ETE published "Williams Commercial Revenue Synergy Opportunities" (the "Synergy

[3] A true copy of that Investor Presentation is attached as Exhibit 2.

Publication").[4] This also presented on page 3 of 8 the **$2 billion in annual synergies** and a partial breakout of its components.

16. The Press Release, Investor Presentation, and the Synergy Publication were each "group published documents" as defined in *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1253 (10th Cir. 1997).

17. On information, belief, and by their own admission, Williams and ETE, through one or more of each of their executive officers, and one or more of the directors on Williams' strategic review committee, negligently made or approved the statement in the Press Release and the Investor Presentation, asserting **in excess of $2 billion in increased EBITDA *annually* in 2020 and after.** On information, belief, and by its own admission, ETE, through one or more of its executive officers, created the Synergy Publication, and negligently made or approved the statement of increased EBITDA **annually** in excess of **$2 billion** and the breakout of that figure therein.

18. Of the 22 bullet points listed above as potential benefits of the merger, several derive their value from the projected commercial synergies said to be **in excess of $2 billion *annually*** beginning in 2020. This estimate was materially overstated. When the projected commercial synergies are eliminated or adjusted lower to account for factual errors and/or misstatements, the suggested value to Williams' shareholders is materially overstated. The economic rationale for a merger ***disappears***.

19. One of the larger elements in the ***annual* $2 billion negligent misrepresentation** is the projected uplift to EBITDA from commercial synergies in the Northeast liquids business of the combined companies. Williams/ETE claim they can divert 200-300 thousand barrels per day

[4] A true copy of the Synergy Publication is attached as Exhibit 3.

("BPD") of natural gas liquids ("NGL") volumes with ethane rejection, and up to 500 thousand BPD with full ethane recovery, onto pipelines operated by ETE (and its affiliates), while potentially base-loading a new project with NGL volumes currently controlled by Williams. This assumption, which accounts for $350 - $850 million of the projected **$2 billion** in commercial synergies, depending on ethane rejection/recovery, is materially overstated by a factor of 10 or more, depending on the purported ability of Williams through WPZ to entice uncontrolled barrels onto ETE pipelines. Williams Quarterly Data Book, 3rd quarter 2015, page 30, shows that it only produces 113 million gallons or 29 thousand BPD of total NGL in the Northeast,[5] and WPZ only showed 4 million gallons or 1 thousand BPD of non-ethane equity sales in its 3rd quarter data book, p. 30.[6] The actual synergistic opportunity for commercial synergies from the NE liquids business is a small fraction of what has been represented. Moreover, it is unclear **which entity** (ETC or ETE) would receive a benefit, if there ever will be one. According to the May 13, 2015, Williams' Analyst Day presentation on page C-17, the ethane already flows to Sunoco (ETE) and, therefore, there are only synergies associated with the non-ethane volume.[7]

20. Within the ***annual*** **$2 billion negligent misrepresentation** is a forecast for $300-$400 million of incremental EBITDA that Williams/ETE is to achieve by diverting 60 thousand BPD[8] of incremental Williams volume in the Rockies region to baseload a new pipeline that connects with ETE's Godley processing plant and Mont Belvieu. This is not probable or even possible. The Williams Quarterly Data Book, 3rd quarter 2015,[9] page 34, shows that WPZ West

5 A true copy of the Williams Quarterly Data Book, Third Quarter 2015 is attached as Exhibit 4.
6 Exhibit 4.
7 A true copy of the May 13, 2015 Williams' Analyst Day presentation is attached as Exhibit 5.
8 Jamie Welch, CFO of ETE.
9 Exhibit 4.

only has 79 million gallons or 20.5 thousand BPD of NGL equity sales. Further, the liquids from WPZ's Rockies plants already have access to Williams' Conway and OneOk's Bushton fractionator and market spreads between Conway and Mont Belvieu are less than 8 cents per gallon (per Oil Price Information Service reports) for all products rather than the unsupported and hypothetical, non-market related $0.15 per gallon incorporated into the $300-$400 million uplift projected by Williams/ETE in presentations to analysts and institutional investors.[10] Not only are the estimates from Williams/ETE for this project factually overstated, the project is not economically viable using the actual volumes available from Williams, and the current market rate. Therefore, this entire $300-$400 million synergistic benefit to shareholders is a fake and known to be false. Moreover, it is unclear **which entity** (ETC or ETE) would receive a benefit, if there ever will be one.

21. A third knowing element of the ***annual*** **$2 billion negligent misrepresentation** is reflected in guidance from Williams/ETE for projections of $250 million in incremental EBITDA from bringing compression services in-house following the business combination.[11] In reality, Williams already benefits from captive compression due to its acquisition of Access in 2014. In fact, the benefit of captive compression is mostly reflected in the ongoing economics of WPZ's business, so there is virtually zero synergistic opportunity for additional incremental EBITDA.

22. A further element in the ***annual*** **$2 billion negligent misrepresentation** is that another $160 million of EBITDA could be generated by connecting ETE's Transwestern system with WPZ's Northwest Pipeline system ("NWPL"), and adding bi-directional capability to the

[10] Jamie Welch, CFO of ETE.

[11] Exhibit 6, Wells Fargo Securities, "Equity Research – Energy Transfer Equity, L.P.," p. 2 at "(2)" (based on company guidance).

network.[12] There is a blatant omission in this representation because the pipes are already connected via piping at the outlet of various processing plants in the San Juan Basin. Moreover, NWPL is already fully subscribed by existing customers for an average remaining life of 9 years according to the May 13, 2015 Williams' Analyst Day package on page E-9.[13] Virtually all of the $160 million in EBITDA ascribed to this "synergistic" idea is unattainable or would be enjoyed by NWPL shippers who hold/control the capacity.

**Negligent Misrepresentations in the S-4 Registration Statement and its Amendments**

23. On November 24, 2015 a draft Form S-4 Registration Statement was filed with the Securities Exchange Commission by ETE and Williams (the "S-4"). The S-4 states that synergies will annually "**exceed $2 billion beginning in 2020**."[14] This was a negligent material misrepresentation as shown above. It was made by Williams and ETE in their joint filing.

24. A first pre-effective amendment to the S-4 was filed on January 12, 2016 (the "Amendment"). The S-4[15] and the Amendment[16] contain a pro forma financial table for ETC incorporating certain of the synergy information. However, in the Amendment the following statement has been added concerning the table:[17]

> HOWEVER, WMB BELIEVES THAT THE ABOVE PROSPECTIVE FINANCIAL INFORMATION IS NO LONGER VALID BECAUSE IT WAS PREPARED SEVERAL MONTHS PRIOR TO THE DATE OF THIS PROXY STATEMENT/PROSPECTUS, AND SINCE SUCH TIME THE INDUSTRY IN WHICH WMB AND ETE OPERATE HAS BEEN UNDER PRESSURE AS A RESULT OF LOWER COMMODITY PRICES AND HIGHER COSTS OF CAPITAL. SEE THE SECTION TITLED "SUMMARY – RECENT DEVELOPMENTS."

---

[12] Exhibit 6, p. 2 at "(3)" (based on company guidance).
[13] Exhibit 5.
[14] A true and correct copy of page 147 from the S-4 is attached as Exhibit 13.
[15] A true and correct copy of page 146 from the S-4 is attached as Exhibit 14.
[16] A true and correct copy of page 147 from the Amendment is attached as Exhibit 15.
[17] Exhibit 15.

This was an admission by Williams and ETE of the misrepresentation of the estimate of increased EBITDA from commercial synergies that would exceed **$2 billion** *per year* that was made on September 28, 2015 in the Press Release published in the *Tulsa World* and on web links, and repeated in the S-4. The statement, however, is a negligent misrepresentation because it attributes the synergy invalidity to "lower commodity prices and higher costs of capital," when in fact Williams and ETE were negligent in their **$2 billion** statement because of physical limitations outlined in paragraphs 19-22, irrespective of industry conditions including changes in commodity prices and costs of capital in the relevant time frame.

**Partial Revocation of $2 Billion in Annual Synergies**

25. On March 23, 2016, ETE and Williams filed their 3rd Amendment to the S-4. In it they revoked the anticipated EBITDA synergies exceeding $2 billion per year by 2020 and indicated that as of March 23, 2016 ETE and WMB believed "that the base case for EBITDA for annual commercial synergies that is reasonably probable to be achieved by the combined company, is approximately **$170 million per year** by 2020." They then acknowledged that this reduction was "materially less than the $2 billion of anticipated annual EBITDA from commercial synergies per year by 2020, identified by ETE as of September 28, 2015. . . " To explain the monumental overstatement of EBITDA increases from synergies, and the implemented reduction, Williams and ETE in the amendment blamed the "current weak energy price environment and increased cost of capital" as the culprits. This rationale was false and materially misleading to the shareholders of Williams who must vote on the merger. Among other things it creates the dangerous illusion to the shareholder audience and public that if pricing and the cost of capital improve the previously-touted synergies may return.

26. On May 4, 2016 the Defendants continued to backtrack in the filing of a Fifth

Amendment which further reduced the synergies to **$126 million per year** and again admitted the material difference from the previously announced **$2 billion in *annual* synergies**. Unfortunately, the Defendants persisted in negligently misrepresenting the cause of the change from the **$2 billion** to $126 million by attributing it to commodity pricing and cost of capital.[18] Again, this creates the dangerous illusion to the shareholder audience and public that if pricing and the cost of capital improve the previously-touted synergies may return. In fact, Williams and ETE were negligent in their **$2 billion** statement because of physical limitations outlined above in paragraphs 19-22, irrespective of industry conditions including changes in commodity prices and costs of capital. The actual facts on oil and gas pricing derived from the United States Energy Information Administration are as follows:

**OIL AND GAS PRICING**

| **Date** | **WTI-Cushing $ per bbl** | **90 Day Forward $ per bbl** | **12 Month Strip $ per MMBtu** | **Event on Date** |
|---|---|---|---|---|
| Sept. 28, 2015 | $44.40 | $44.92 | $2.82 | Press Release and Web Link to Power Point Presentation |
| Nov. 24, 2015 | $40.89 | $44.22 | $2.45 | S-4 filing |
| Jan. 12, 2016 | $30.42 | $31.53 | $2.49 | 1st Amendment |
| March 7, 2016 | $37.90 | $39.58 | $2.20 | 2nd Amendment |
| March 23, 2016 | $38.28 | $40.76 | $2.32 | 3rd Amendment |

27. The cost of capital exemplified by the rate of interest paid on bonds of ETE, ETP, and WMB, is as follows:

[18] Exhibit 18 is a true and correct copy of page 18 from the 5th Amendment to S-4 showing the revision to $126 million and the purported rationale for it.

## COST OF CAPITAL

| Date | Bond Due 10/15/20 | Bond Due 2/01/22 | Bond Due 01/15/23 | Event on Date |
|---|---|---|---|---|
| Sept. 28, 2015 | 7.41% | 5.00% | 7.50% | Press Release and Web Link to Power Point Presentation |
| Nov. 24, 2015 | 6.34% | 5.60% | 7.42% | S-4 Filing |
| Jan. 12, 2016 | 10.95% | 6.84% | 10.42% | 1st Amendment |
| March 7, 2016 | 9.00% | 7.31% | 8.96% | 2nd Amendment |
| March 23, 2016 | 8.31% | 6.14% | 8.59% | 3rd Amendment |

28. These tables demonstrate that the significant reduction in oil and gas pricing, and the increase in cost of capital, had occurred prior to September 28, 2015, and there has been little change of consequence since then. The Defendants were aware upon filing the Third Amendment that the substantial error in the **$2 billion in *annual* synergies** statement was not caused by the change in oil and gas pricing, and the cost of capital. This awareness existed from the initial filing of the S-4 on November 24, 2015,[19] but the Defendants gamed the S-4 process for four months, until finally reducing their synergies estimate, but even then they misrepresented the cause for the wild misstatement of synergies! The mix of information crucial to an informed shareholder vote on the Williams merger remains corrupted through today. The implication is left that with higher commodity prices and lower cost of capital the increased annual EBITDA may occur. This is an illusion created by the misleading statements in the 3rd and 5th Amendments.

29. Furthermore, in none of their disclosures, including the press release, have the Defendants ever disclosed WHO exactly benefits, if there are indeed synergies.

30. A negligent material omission exists in the 5th Amendment to the S-4 concerning

[19] Exhibit 19 is a true and correct copy of page 112 from the 5th Amendment to the S-4, that states, "During August of 2015, representatives of WMB management prepared additional WMB forecasts with the help of Barclays and Lazard to consider the potential effects of changing market conditions, including lower commodity prices."

share holdings by members of Williams Board of Directors in ETE, or of its newly-created Convertible Units, which are disclosed on page 21 of the 5th Amendment to the S-4.[20] That holdings in ETE by members of the Board of Directors is material is shown in, among other places, page 104 of the 5th Amendment, where it is reported that, "The WMB Board also authorized Cravath and Gibson Dunn to survey the members of the WMB Board to identify each director's holdings in ETE."[21] The Defendants allege in their motion to dismiss that the Williams Board determined that such holdings were not a conflict, but they do not disclose the amount of such holdings and when the determination was made. At least one member of the Williams' Board of Directors is believed to own ETE shares. This is shown in the attached Exhibit 24 showing that Corvex Management LP owns a 6,500,000 unit call option of ETE. Corvex holdings are aggregated with those of Mr. Keith Meister, a member of the Williams' Board. In addition, there is no disclosure showing this specific conflict has been isolated, and that any such director, identified as a Reporting Person in footnote (4) on page 185 of the 5th Amendment,[22] has recused himself from participating in, discussing, or voting on the transaction, since the acquisition of these options.

31. A further negligent material omission in the 5th Amendment to the S-4 is the omission of any disclosure concerning specific votes of the Williams Board. There appears on page 25[23] of the S-4 the following statement:

> Certain members of the WMB Board voted on September 28, 2015 against entering into the merger agreement and continue to disagree with the recommendation of a majority of the WMB Board and WMB stockholders adopt the merger agreement. See section titled "The Merger – Background

---

[20] Exhibit 20 is a true and correct copy of page 21 from the 5th Amendment to the S-4.
[21] Exhibit 21 is a true and correct copy of page 104 from the 5th Amendment to the S-4.
[22] Exhibit 22 is a true and correct copy of page 185 from the 5th Amendment to the S-4.
[23] Exhibit 23 is a true and correct copy of page 25 from the 5th Amendment to the S-4.

> of the Merger" beginning on page 100 of this proxy statement/prospectus. Notwithstanding their continuing disagreement with the recommendation of the majority of the WMB Board, these directors fully support the WMB Board's commitment to consummate the transaction as required by the terms of the merger agreement. The WMB Board is unamiously committed to enforcing WMB's rights under the merger agreement and to delivering the benefits of the merger agreement to WMB stockholders.

There is nowhere disclosed how it was ascertained that the directors who voted against the transaction "fully support the WMB Board's commitment to consummate the transaction as required by the terms of the merger agreement." The same is true of the final sentence of the quoted statement as well. The Williams' shareholders are entitled to know what actions the Board of Directors has taken, and how these assessments that are vital to the ongoing existence of the transaction were made.

32. The S-4 and the Amendments to it are "group published documents" by ETE and Williams. On information and belief, Williams and ETE, through one or more of each of their executive officers, and one or more of the directors on Williams' strategic review committee, negligently made or approved the S-4 and the Amendments as referenced herein.

33. The above misrepresentations and omissions are of a character that a reasonable stockholder would consider it important in deciding how to vote. The misrepresentations and omissions alleged above violate Section 14(a) of the 1934 Securities Exchange Act.

34. The dissemination of proxy materials and the conduct of a special shareholders' meeting of Williams are essential links in accomplishing the proposed merger.

35. The proposed merger of Williams with ETC, the dissemination of proxy materials and the conduct of a special shareholders' meeting of Williams should be preliminarily and permanently enjoined unless proper disclosure is made.

**Irreparable Harm to Williams' Shareholders**

36. Upon information and belief, the shareholders of Williams and the investing public are being irreparably injured and harmed by Defendants' conduct in an amount that cannot be calculated and compensated for by money damages, in that, inter alia:

A. The Williams corporate entity will not survive the proposed transaction and will, in fact, disappear through a merger.

B. Williams shareholders presently are compelled to make investment decisions concerning their Williams stock without the benefit of proper material information that Defendants are required by law to provide.

C. Defendants' unlawful conduct has resulted in confusion and misunderstanding on the part of shareholders and the general public as to the true intentions of Defendants.

D. The widespread confusion and uncertainty created by Defendants' false and misleading statements will continue to cause serious dislocations in the market for Williams' stock and the operations of Williams' business.

**Likelihood of Success**

37. There is a strong likelihood of success on the merits in this action. As shown above, there are multiple misrepresentations and omissions, any one of which would qualify for a violation of Section 14 of the 1934 Securities Exchange Act. Moreover, the misrepresentations are shown by existing disclosures of fact that are virtually irrefutable.

**Balance of Equities**

38. Further, the balance of equities tip in favor of the Plaintiff. Plaintiff is a single stockholder, though his claim is representative of that of all stockholders of Williams, each of

whom are victims of the vast power of the corporate machinery of Williams and ETE, and of Williams' directors, who appear to have fallen out of touch with reality, and who relied on investment bankers who have much to gain from the execution of the Proposed Acquisition as shown in their conflict disclosures. It is far better for this Court to act to protect the interests of the individual shareholders than to allow the corporate chicanery that accompanies the Proposed Acquisition.

**Public Interest**

39. Finally, an injunction will clearly serve the public interest by speaking to shareholders' rights to correct and complete information and preserving a strong competitor within the industrial sectors in which Williams participates, as opposed to creating a large combined company. Further, the price offered for the Williams stock is lower by over two thirds from the implied amount of the initial offer by ETE, which was rejected by the Williams Board of Directors as being inadequate. Finally, the Proposed Acquisition lacks a premium, and rather than allocate the value of Williams to its highest use, it transfers ownership of Williams for inadequate consideration.

**Class Action Allegations**

40. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other public stockholders of Williams as of September 28, 2015, and thereafter (the "Class"). Excluded from the Class is any individual or entity affiliated with either Defendant.

41. This action is properly maintainable as a class action.

42. The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, there were more than 749 million shares of Williams' common stock outstanding as of September 25, 2015.

43. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include the following:

(a) whether the Defendants have violated Section 14 of the Securities Exchange Act by making material misrepresentations or omissions; and

(b) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Acquisition consummated.

44. Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff does not have any interests adverse to the Class.

45. Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

46. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

47. Defendants have acted, or failed to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**COUNT 1**

48. Defendants' material misrepresentations and omissions alleged above are in violation of Section 14(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78n, and warrant the issuance of a preliminary and a permanent injunction.

49. The Defendants negligently made the representations and omissions as alleged herein.

50. Defendants accomplished the acts constituting the false representations by the use of the means and instrumentalities of interstate commerce including, but not limited to, the United States Mails and interstate telephone and internet facilities.

51. The foregoing acts and misrepresentations constitute a common plan, scheme and conspiracy to violate the federal securities laws in which the Defendants materially participated. Accordingly, all of the acts in furtherance of the scheme are attributable to each of the Defendants, regardless of which particular Defendant was the actor.

WHEREFORE, Plaintiff, for himself and the Class, respectfully prays for this Court to issue a preliminary and permanent injunction enjoining each of the Defendants from further proceeding with a proposed merger, including the dissemination of proxy materials, and the conduct of a special shareholders' meeting of Williams until they properly and publicly correct the mix of information available to Williams' shareholders to exercise their vote on the merger by clearly and truthfully disclosing (1) how the misstatement of $2 billion in synergies occurred, (2) the specific facts and calculations related to the $2 billion in synergies reduction, (3) the holdings by members of the Board of Directors of Williams of ETE or ETE's Convertible Units, and (4) how the determinations were made concerning the Board of Directors as set forth in ¶ 31, above.

s/Laurence L. Pinkerton
Laurence L. Pinkerton, Esq. (OBA #7168)
PINKERTON LAW, P.C.
Penthouse Suite
15 E. 5th Street
Tulsa, Oklahoma 74103-4303
(918) 587-1800
(918) 582-2900 - Fax
pf@att.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2016, I electronically transmitted the foregoing pleading, to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Antony L. Ryan, Esq.
Sandra C. Goldstein, Esq.
Elliot Paul Anderson, Esq.
Michael James Gibbens, Esq.
Mary H. (Molly) Tolbert, Esq.
Jessica Lynn Dickerson, Esq.
William Suttle Leach, Esq.
Stefan H. Atkinson, Esq.
Marisa Antos-Fallon, Esq.
Clifford Thau, Esq.
John C. Wander, Esq.

/s/ Laurence L. Pinkerton