## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHN BUMGARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-26-GKF-FHM |
| | ) | |
| THE WILLIAMS COMPANIES, INC., and | ) | |
| ENERGY TRANSFER EQUITY, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED OPINION AND ORDER

Before the court are the motions, filed by defendants The Williams Companies, Inc.

("Williams") and Energy Transfer Equity, L.P. ("ETE"), to dismiss the Second Amended Class

Action Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which

relief can be granted.  [Dkt. ##68-69].  Plaintiff John Bumgarner ("Bumgarner") brings this

action to enjoin the defendants from further proceeding with a proposed merger.  In his Second

Amended Complaint, brought for himself and for members of a proposed class of Williams

shareholders, Bumgarner alleges defendants and their representatives made false or misleading

representations or omissions when soliciting proxies for the shareholder vote on the proposed

merger, in violation of § 14 of the 1934 Securities Exchange Act, 15 U.S.C. § 78n.  Defendants

move to dismiss, arguing that the statements fall under a safe harbor for forward-looking

statements in 15 U.S.C. § 78u-5(c) and that Bumgarner has not alleged sufficient facts to support

a claim that the alleged omissions amount to a securities violation.

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine

whether the plaintiff has stated a claim upon which relief can be granted.  A complaint must

contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  The plausibility requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of the conduct necessary to make out the claim.  *Id.* at 556.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555 (quotations omitted).  The court "must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007).

Section 14(a) of the Securities and Exchange Act forbids proxy solicitations that contravene the rules and regulations of the Securities and Exchange Commission ("SEC").  15 U.S.C. § 78n(a)(1).  One of those rules, Rule 14a-9[1], prohibits proxy solicitations by means of any communication containing false or misleading statements or omissions that are material to the proxy solicitation.  17 C.F.R. § 240.14a-9.  A plaintiff claiming a violation of § 14(a) by way of Rule 14a-9 must establish three elements: (1) the proxy statement contained a material misrepresentation or omission; (2) the defendant acted with the requisite state of mind; and (3) the proxy statement was the essential link in completing the transaction at issue.  *See In re Zagg Securities Litigation*, 2014 WL 505152, *7 (D. Utah 2014) ("*Zagg I*"); *see also Lane v. Page*, 581 F.Supp.2d 1094, 1111 (D.N.M. 2008).

In his Second Amended Complaint, Bumgarner alleges the defendants initially communicated to shareholders that the proposed merger would result in an estimated $2 billion

---

[1] Bumgarner does not explicitly invoke Rule 14a-9 in the Second Amended Complaint.  Defendants have characterized the Second Amended Complaint as alleging a violation of § 14(a) by way of violating Rule 14a-9.  Bumgarner has not objected to this characterization.

in synergies, but later reduced that estimate twice—to $170 million and then to $126 million. The court previously determined that such projections are "forward-looking statements" that fall under 15 U.S.C. § 78u-5, a statutory "safe harbor." [Dkt. #58, pp. 4-9]. In response to the motions to dismiss, Bumgarner concedes the estimates themselves are not actionable under the court's prior ruling, but argues the § 14(a) claim in the Second Amended Complaint is based on other statements explaining the reduced estimates. The Second Amended Complaint alleges defendants explained the reductions in a proxy statement issued on May 4, 2016 ("the May 4 proxy").[2] [*See* Dkt. # 66, p. 2].

Bumgarner argues defendants attributed the reduced estimates to lower commodity prices and higher costs of capital. Defendants argue the May 4 proxy points to additional factors. Specifically, defendants argue the May 4 proxy "attributed [the synergies reduction] to an array of factors . . . including energy producers' curtailing of growth projects and shutting-in production" and "a host of reasons that extend beyond just commodity prices and cost of capital." [Dkt. #94, pp. 8-10]. However, although the May 4 proxy refers to the curtailing of growth projects by oil producers and to lower production levels, defendants clearly explained— in the same sections of the May 4 proxy—that growth projects and production levels are ultimately dependent on commodity prices and the cost of capital. [*See, e.g.*, Dkt. #94, pp. 9-10 ("Most producers of oil and natural gas have recently reduced their levels of drilling and related projects to preserve existing liquidity and reduce financing needs in light of continued low prices and infrastructure constraints, as well as higher costs of capital . . . . The annual EBITDA that is reasonably probable of being achieved from commercial synergies by 2020 of $126 million is an

_____

[2] In the Opinion and Order dated May 26, 2016 [Dkt. #82]—which the court now amends—the court mistakenly stated that defendants had explained the reduction in projected synergies in an Amendment to the S-4 dated January 12, 2016. The language cited in the January 12, 2016 Amendment referred to changes in prospective financial information that predated defendants' reduction of the estimated synergies.

amount determined by commercial development and finance personnel from ETE and [Williams] based on their analysis of commercial development projects that are reasonably probable to be successfully completed and based on, among other items, assumptions of WTI crude oil prices . . . and Henry Hub natural gas prices . . . which price assumptions were based on the forward price curve for futures contracts as of January 20, 2016.")].  Thus, in the May 4 proxy, the curtailing of growth projects and reduced production do not offer independent support for the reduced synergies estimate, but are simply two implications of lower commodity prices and higher costs of capital.

Although defendants do not specifically point to this phrase, the May 4 proxy also refers to "infrastructure constraints" as a reason for the reduced synergies estimate.

> Most producers of oil and natural gas have recently reduced their levels of drilling and related projects to preserve existing liquidity and reduce financing needs in light of continued low prices and infrastructure constraints, as well as higher costs of capital.  In some areas, producers are shutting-in production until realized prices improve as a result of higher energy prices and/or new infrastructure that improves netbacks.  [Dkt. #94, p. 9-10 (emphases omitted)].

The May 4 proxy does not identify any specific infrastructure constraints.  "Infrastructure constraints" are listed alongside low commodity prices and higher costs of capital as the reasons for less drilling and "related projects."  At this stage, the court may reasonably infer that the unspecified "infrastructure constraints" are themselves the result of continued low commodities prices and higher costs of capital.

In the May 4 proxy, defendants now estimate that, if commodity prices recover, the annual EBITDA that may be potentially achieved by 2020 from commercial synergies would approximately $590 million.  [Dkt. #94, p. 11].

Bumgarner alleges defendants' explanation for reducing the projected synergies is a negligent misrepresentation in violation of § 14(a).  He alleges the reduction in estimated

synergies was necessary—not because of lower commodity prices, higher costs of capital, and infrastructure constraints—but because Williams and ETE were negligent in their initial $2 billion projection because of specific "physical limitations" that made the $2 billion projection unattainable.[3]  [*See* Dkt. #61, ¶¶ 19-22, pp. 9-12].  In addition, Bumgarner alleges commodity prices had already declined significantly by the time Williams and ETE made their representations of $2 billion in synergies.  Thus, Bumgarner contends defendants' explanation— that the reduced estimates were based on commodity pricing, cost of capital, and infrastructure constraints—is false and misleading in itself because a reasonable investor would be led to believe that if those conditions improve, the additional synergies may return.

Defendants argue the explanation for the reduced synergies estimates is subject to the same safe harbor as the estimates themselves because the safe harbor applies, not only to forward-looking statements, but to statements supplying the *basis* for forward-looking statements.  However, defendants' explanation does not fit in this category.  Defendants cite commodity pricing, higher costs of capital, and infrastructure constraints not as the basis for a forward-looking projection, but as justification for a revision that has already occurred. Defendants' explanation for reducing the projected synergies is a statement of existing fact and may be verified based on information now available.  This is no less true because defendants' statements attempt to explain changes made to other statements that are themselves forward-looking.  Thus, the rationale behind the safe harbor for forward-looking statements does not apply here.

---

[3] For example, Bumgarner alleges that the projection of $2 billion in annual synergies was based in part on anticipated synergies of $160 million to be obtained by connecting ETE's Transwestern pipeline system with Williams's Northwest pipeline system.  [*Id.* at pp. 11-12].  Bumgarner alleges the two systems are already connected.  [*Id.*].

Defendants also argue the explanation for the reductions in estimated synergies is immaterial.  Information is material if it "significantly alter[s] the total mix of information available" to shareholders.  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).  As noted above, the court previously determined the synergies estimates were forward-looking statements under § 78u-5, and were accompanied by "meaningful cautionary statements."  [Dkt. #58, p. 9].  Under the Tenth Circuit's "bespeaks caution" doctrine, "[f]orward-looking statements are . . . considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect."  *Grossman*, 120 F.3d at 1120.  Defendants argue the explanation for the reductions in the synergies estimates is related to forward-looking statements that are, by law, immaterial, and thus cannot be material itself.

Defendants' argument is appealing, but ultimately unpersuasive.  Under the facts as alleged in the Second Amended Complaint, defendants have now issued four synergies projections.  Those projections are immaterial—because they are forward-looking statements accompanied by adequate cautionary language—but their immateriality is not fatal to Bumgarner's § 14(a) claim.  This is because the Second Amended Complaint states a claim based, not on the projections themselves, but rather on defendants' explanation for the revisions to the projections.  As noted above, the alleged misrepresentation in defendants' explanation— attribution of the synergies reduction to lower commodity prices, higher costs of capital, and infrastructure constraints—was not a forward-looking statement, but was rather a statement of then-current fact to explain the reduction.  Thus, the "bespeaks caution" doctrine, which renders certain forward-looking statements immaterial, does not apply.

Furthermore, the alleged misrepresentation significantly alters the total mix of information available to shareholders.  Bumgarner alleges the explanation was misleading because, when considered along with the prior and current synergies projections, the clear implication for the shareholder audience and public is that several hundred million dollars[4] in additional synergies will obtain—all else being equal—if market conditions return to the levels prevailing prior to the approval of the merger agreement.  The only qualifications on those additional projected synergies are commodity prices, the cost of capital, and unspecified infrastructure constraints.  As alleged, defendants' explanation contains no other cautionary language.  As noted above, Bumgarner alleges defendants know there are—but omitted from their explanation—other reasons the higher synergies estimate is unattainable.  Accepting the well-pleaded allegations in the Second Amended Complaint as true, the total mix of information—including the synergies projections and defendants' explanation for the reductions therein —could materially mislead shareholders.  Bumgarner has adequately alleged a violation of § 14(a).

Bumgarner also alleges the amended S-4 contains a material omission because it fails to disclose a conflict of interest for a Williams shareholder who may also hold an interest in ETE.  Bumgarner alleges such an individual exists based on "information and belief," but the Second Amended Complaint alleges no facts in support.  Under 15 U.S.C. § 78u-4(b)(1)(B), "if an allegation regarding [a] statement or omission is made on information and belief, the complaint

---

[4] As noted above, in the May 4 proxy, defendants estimated that if commodity prices recover, annual EBITDA of $590 million from commercial synergies may be achieved.  Based on that estimate, a reasonable investor could conclude that improved commodity prices would yield $464 million in annual EBITDA from commercial synergies *in addition* to defendants' current projection of $126 million.  Four hundred and sixty-four million dollars in annual synergies is sufficiently large to "significantly alter the total mix of information available to shareholders."  This is true, even if, as defendants contend, a reasonable investor would not credit defendants' earlier estimate of $2 billion in annual synergies.

shall state with particularity all facts on which that belief is formed." Accordingly, the Second Amended Complaint does not state a claim based on a failure to disclose a conflict of interest.

Prior to the amendment of this Opinion and Order, Bumgarner voluntarily dismissed the claim asserted in paragraph 30 of the Second Amended Complaint, which alleged defendants had failed to disclose a conflict of interest on the part of a Williams board member at the time the board voted to approve the merger agreement. Thus, the court need not address the arguments in defendants' motions seeking dismissal of this claim.

Finally, Bumgarner alleges one other material omission. The 5th Amendment to the S-4 states that some Williams board members voted against the merger, but they nonetheless support the board's commitment to consummate the transaction as required by the terms of the merger agreement. Bumgarner alleges defendants failed to disclose "how it was ascertained that the directors who voted against the transaction" nevertheless support the board's commitment to consummate the transaction. Defendants argue Bumgarner does not dispute the truth of that disclosure. Furthermore, defendants contend that Bumgarner's allegation falls short because he relies on truthful information contained in the proxy statement and argues that defendants must tell him more about the subject of those statements. Defendants' argument is persuasive. The alleged omission—the precise manner in which it was determined that the directors who voted against the transaction expressed their support for the board's commitment to the merger agreement—is insufficient to state a claim under § 14(a). *See Erickson v. Hutchinson Tech. Inc.*, 2016 WL 310729, at *6 (D. Minn. Jan. 26, 2016); *Himmel v. Bucyrus Int'l, Inc.*, 2014 WL 1406279, at **16-17 (E.D. Wis. Apr. 11, 2014).

WHEREFORE, defendants' motions to dismiss the Second Amended Complaint for failure to state a claim [Dkt. ##68-69] are granted in part and denied in part. Defendants'

motions are denied as to Bumgarner's claim based on an alleged negligent misrepresentation or omissions in defendants' explanation for the reductions in the synergies estimate.  Defendants' motions are granted as to Bumgarner's claim based on an alleged failure to disclose how it was ascertained that the Williams directors who voted against the transaction fully support the board's commitment to consummate the transaction as required by the terms of the merger agreement.

IT IS SO ORDERED this 3rd day of June, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT